UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____X

| | |
|---|---|
| Jeffrey Daniels | Civil Action<br>No: 04-12030-RBC |
| Plaintiff | |
| VS. | |
| National Railroad Passenger<br>Corporation | OCTOBER 18, 2006 |
| Defendant | |

_____X

## PLAINTIFF'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF POSITIVE POST- ACCIDENT DRUG TEST AND TO PRECLUDE QUESTIONS AND EVIDENCE CONCERNING DRUG USE

The plaintiff moves, *in limine*, to preclude the defendant from (1) questioning any witnesses or offering any evidence concerning the post-accident drug test and the test results[1]; (2) questioning the plaintiff about drug use beyond the 24 hour time period before the accident; and (3) offering any evidence from its toxicologist Brian Pape.

It is undisputed that the plaintiff fell at work on July 19, 2002 at approximately 10:00 a.m. in the morning. *See* App. A, Amtrak Injury/Illness Report. The operator of a hi-rail truck spun the rear wheels and caused stones to kick up at the plaintiff. The plaintiff fell while stepping backwards to avoid the stones and struck his right shoulder on the steel rail of the track. The plaintiff's treating orthopedic doctor testified at his trial deposition that the plaintiff suffered tendonitis and impingement of his shoulder joint

---

[1] So far the plaintiff has identified Exhibits 4, 5, 6, 39, 41 and 42 as containing irrelevant and prejudicial information about the drug test and drug test results.

following the accident and needed to undergo surgery. There is no medical testimony disputing his opinion. After receiving medical treatment at Milton Hospital, Amtrak ordered the defendant to undergo a drug test at the hospital as a matter of routine post-accident procedures. The drug test result was positive for cocaine metabolites. There is no evidence that the plaintiff appeared under the influence of drugs on the morning of the accident. The plaintiff testified that he did not ingest any drugs within a 24 hour time period before the accident. When asked at his deposition about drug use during the 24-48 hour time period before the accident, the plaintiff asserted his Fifth Amendment right against self-incrimination.

**Dr. Pape's Disclosed Opinions Are Not Relevant**

The defendant disclosed Brian Pape, Phd., as an expert toxicologist on April 28, 2006. The only opinions Dr. Pape was disclosed to provide were that (1) "The [drug test] results indicate the presence of cocaine and/or cocaine metabolite; and (2) Mr. Daniels positive urine drug test result is reliable evidence that he consumed cocaine." *See* App. B, Dr. Pape's Affidavit - Def.'s Expert Disclosure.

Dr. Pape's opinions are not relevant. A positive drug test following the accident is not probative of whether Mr. Daniels was under the influence of the drug at the time of the accident or whether the drug use contributed to the accident in any way. There is no evidence that the plaintiff was impaired or acting in an impaired manner at any time during the morning before the accident. Just because the plaintiff had cocaine metabolites in his system after the accident does not mean that he was under the influence of cocaine at the time of the accident. It is commonly known that cocaine metabolites can stay in a person's system for as long as 3 days. *See* App. C, *Medline*

*Plus; Wikipedia Medical Encyclopedia; Schaffer Library of Drug Policy*.  Dr. Pape was

not disclosed to provide any opinions about whether the plaintiff was under the influence

of cocaine at the time of the accident or whether his use of cocaine impaired his ability

to function at the time of the accident.[2]  *See* Fed. R. Civ. P. 37(c)(1)(requiring preclusion

of matters not disclosed pursuant to Rule 26(a) absent showing of substantial

justification and harmlessness).  Had the plaintiff been aware that Dr. Pape intended to

offer additional opinions beyond the two that were disclosed, he would have hired or

consulted his own toxicologist.  Since Dr. Pape was not disclosed to give any opinions

about the amount of cocaine in his system at the time of the accident or the effects the

amount of cocaine in the plaintiff's system at the time of the accident, his testimony

simply does not prove or disprove any fact relevant to the plaintiff's accident.

Accordingly, Dr. Pape's testimony should be precluded because it is simply not relevant.

*See* Fed. R. Evid. 402.

To the extent there is any relevance to opinions that the plaintiff "consumed

cocaine" and tested positive for cocaine after the accident, this evidence should not be

admitted because any probative value is substantially outweighed by the danger of

unfair prejudice.  Accordingly, Dr. Pape's testimony should be precluded because there

is a high likelihood that the jury will be unfairly prejudiced against Mr. Daniels because

he had cocaine metabolites in his system.  *See* Fed. R. Evid. 403; *see also Mankey v.*

*Bennett,* 38 F.3d 353, 360 (7th Cir. 1994) (affirming trial court's refusal on Rule 403

---

[2] On October 11, the Defendant set forth in the Parties' Joint Pretrial Memorandum that Dr. Pape would testify about "the body's metabolism of cocaine, and the effects of cocaine."  The plaintiff has filed a separate Motion *In Limine*, in the event the Court does not grant the instant motion, to preclude Dr. Pape from testifying about opinions that were not set forth in his April 28, 2006 disclosure.

grounds to admit evidence of a plaintiff's prior substance abuse in the absence of any expert opinion connecting it to any issue in the case).

Moreover, evidence of a positive drug test is being offered solely to prejudice, confuse, and mislead the jury.  The Court should preclude any evidence about the positive drug test because it is not relevant and is unduly prejudicial.  *See* Fed. R. Evid. 402 and 403; *Mankey*, *supra* at 360.

## QUESTIONS ABOUT DRUG USE BEYOND THE 24 HOUR TIME PERIOD BEFORE THE ACCIDENT SHOULD BARRED

In light of the foregoing, the Court should preclude the defendant from asking the plaintiff about drug use beyond the 24-hour time period before the accident.  The plaintiff will assert his Fifth Amendment right against self-incrimination in response to any questions about cocaine ingestion in the 24-48 hour time period before the accident.  The questions themselves would be highly prejudicial and the plaintiff's invocation of his Fifth Amendment right against self-incrimination would also be highly prejudicial.  In light of the limited nature of Dr. Pape's opinions, such questions are also not relevant to proving or disproving a material fact in this case.   Accordingly, the Court should also forbid the Amtrak from asking any questions about drug use beyond a 24 hour time period before the accident.

## OBJECTIONS ON PAGE 52 OF DR. TILZEY'S TRIAL DEPOSITION

During Dr. Tilzey's videotaped trial deposition, Amtrak offered Milton Hospital records including records pertaining to the post accident drug test into evidence.   The plaintiff objected to the drug test records as not relevant and unduly prejudicial.   In the event the Court grants the instant motion, the plaintiff also seeks an Order sustaining the plaintiff's objections and permitting the plaintiff to redact the details of the objection

from the transcript and/or videotape so that the jury is not unduly prejudiced by the fact

the records were offered and an objection was made to the drug test documents.

**CONCLUSION**

For the foregoing reasons, and any additional reasons set forth at the pretrial

conference, the plaintiff respectfully requests that Amtrak be barred from (1) offering

any evidence concerning a post-accident drug test and the test results; (2) questioning

the plaintiff about drug use beyond a 24 hour time period before the accident; and (3)

offering any evidence from its toxicologist Brian Pape.

FOR THE PLAINTIFF,

BY _____

Scott E. Perry
George J. Cahill, Jr. (BBO #069480)
CAHILL, GOETSCH & MAURER, P.C.
43 Trumbull Street
New Haven, Connecticut  06511
(203) 777-1000

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2006, a copy of the foregoing document was

filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of

the Court's electronic filing system or by mail to anyone unable to accept electronic filing

as indicated on the Notice of Electronic Filing.  Parties may access this filing through the

Court's CM/ECF System.

_____
Scott E. Perry

# *APPENDIX  A*

**Amtrak** ➤➤

## AMTRAK INJURY/ILLNESS REPORT (Revised 10/94)

DIVISION (1): BT    (1A) RESCEN: 7064    DATE OF INCIDENT (2): 07 / 19 / 02 MM DD YY    MULTIPLE INJURY INCIDENT? [Y/N] (3): N

FRA CLASS OF INJURED PERSON [A,B,C,D,E,F] (4): ☐
WAS THIS A GRADE CROSSING ACCIDENT? ☐ YES ☒ NO
WAS THIS A RAIL EQUIPMENT INCIDENT [EQUIPMENT OR TRACK DAMAGE?] ☐ YES ☒ NO

(4A) **PRELIMINARY REPORTABILITY** ☐ YES ☐ NO    (4B) **PRELIMINARY LOST TIME** ☐ YES ☐ NO

### IDENTIFICATION OF INJURED PERSON

(5) 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    Social Security Number **Required** for Amtrak employee.

(6) Name Last: Daniels    (7) First: Jeffery    MI

Home Address: 181 Ropehill Road

City: Wrapham Milton    State: MA    Zip: 02186

Home Phone: 617-697-6778    Sex: (M/F) M    Date of Birth: 12/24/59 MM DD YY    Married/Single (M/S): M

### TIME AND LOCATION OF INCIDENT

(8) Time: 10:00 A HH MM A/P    (9) Facility/Location/Place: River View Road    FM

City: Bellingham    (10) State: MA    Nearest Station

Milepost: 32    Track No. 174    Train No.    Car No.    Lead Loco. No.    Second Loco. No.

Seat No./Room No.    Passenger Origin    Passenger Destination    (11) Time Incident Reported to Supervisor: 10:20 A HH MM A/P    (12) Date Incident Reported to Supervisor: 07 / 19 / 02 MM DD YY

### DESCRIPTION OF INCIDENT

(13) Describe the activity that the injured person was engaged in: On reaching + turning High Rail trucks to put in the track

(14) Describe how the injury/illness occurred: + truck pull forward + Rocks + Stone were flying up Employee moved out of way + Slipped

(15) Name of the object or substance that directly caused the Injury/illness: 4881 tvsi + West Rail

(16) Describe the Injury/Illness: Right Shoulder + Right Hand

INCIDENT NO.: YY MM DD D DIV NO. SEQ. NO.

### IDENTIFICATION OF IMMEDIATE SUPERVISOR OR PERSON IN CHARGE

(17) 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    Social Security Number **Required** for Amtrak employee.

(18) Name, Last: Mallon    (19) First: Patricia    M.I.: A

Title: Roadmaster    Work Phone ATS    Bell: 617-222-5336

Supervisor's Signature: Patricia A. Mallon

(20) Time 260 completed: 12:00 P HH MM A/P    (21) Date: 07 / 19 / 02 MM DD YY

Was The Person Provided First Aid/Treatment? ☐ Yes ☐ No
Name of Person Accompanying Injured Person to Medical Facility: Patricia Mallon

### INJURED EMPLOYEE INFORMATION

(22) Occupation: Mechanic    (23) Dept.: BtB    (23A) Tour of Duty: 7:00A - 3:30P HH MM A/P HH MM A/P    (23B) Crew Base: 7064    Func.    Work Order No.: 1281

Gang No.: 1992    (24) Extra Board [Y/N]: N    (24) Hours into Shift: 3    Day of Week: FR    (MO,TU,WE,TH,FR,SA,SU)    Rest Days of Week: Su Su

Hire Date: 04 / 15 / 97 MM DD YY    Rule Violation Number

NRPC 260 (10/94)

# AMTRAK INJURY/ILLNESS REPORT
## PERSONAL STATEMENT
### (To be completed and signed by the injured person)

| Last Name | First Name | M.I. | Soc.Sec.No. |
|---|---|---|---|
| Daniels | Jeffery | A | 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 |

| Date of Accident | Place of Accident |
|---|---|
| 7/19/02 | Bellingham MA |

Amtrak may need to contact you within the next 72 hours. Please provide a telephone number(s) where you can be reached.

**Describe Fully How Accident Occurred:** Was Lineing up the High Rail Truck #142 to Put on Rails Driver was Pulling forward and the Tires started Spinning and Kick up Stone ; Debbie I Stepped back to get out of the way and slipped on tie and Slammed against the Rail

**Describe Cause Of The Accident:** lost footing on wet Tie and landed Right shoulder ; Hand against the Rail

**Describe Injury/Illness:** Pain in Swelling in Right Hand and Shoulder.

Were you provided first aid at the place of this accident?    ☐ Yes   ☑ No
Were you taken to a medical facility for treatment?    ☑ Yes   ☐ No
If yes, what was the name of the facility that you were taken to for treatment.

Milton Hospital

Describe the treatment provided: _____

Witnesses: (please print clearly)

| Name | Department | Phone | Address |
|---|---|---|---|
| | | | |
| | | | |

**Signature of Injured Person**   Jeffrey Daniels    **Date** 7/19/02

NRPC 260 (10/94)

## _APPENDIX  B_

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

## Civil Action No.:  04-12030MLW

---

**Jeffrey Daniels, Plaintiff**                                    )
                                                                  )
                                                                  )
**v.**                                                            )
                                                                  )
**National Railroad Passenger Corporation, Defendant**            )

---

## AFFIDAVIT

## BRIAN E. PAPE, Ph.D., BCFE, BCFM

1.  My name is Brian E. Pape.  My scientific expertise is concentrated in the fields of toxicology and related sciences.  A summary of my education-training-experience is attached as an Exhibit.

    I have considerable experience and expertise regarding the conduct-reliability-and-interpretation of urine drug test results; and I have been qualified to offer related expert testimony in State Superior Courts and Federal Courts.

2.    I have reviewed case materials relating to Mr. Jeffrey Daniels and this matter:

> Milton Hospital Emergency Room Record
>
> Milton Hospital Work-related Triage
>
> Alcohol Testing Form (Non-DOT)
>
> AMTRAK Chain-of-Custody relating to urine drug testing
>
> Deposition testimony of Mr. Daniels
>
> Results of a post-accident urine drug test done on a specimen collected from Mr. Jeffrey Daniels on 07/19/2002 and reported by EHP Employee Health Programs Medical Review Officer as Drug Test Results.

The EHP drug test report indicated a "positive" result for cocaine in Mr. Daniels post-accident urine specimen collected on 07/19/2002.

3.    I am familiar with the standard operating procedures (SOPs) and urine drug screen testing on Mr. Daniels' urine.

The SOPs-test methodology-and-quality assurance associated with this type of urine drug testing are generally accepted.  The results indicate the presence of cocaine and/or cocaine metabolite.

4.    Mr. Daniels' positive urine drug test result is reliable evidence that he consumed cocaine.

2

My opinions are based on my review of case-specific evidence, my education-training-experience, generally accepted medical and scientific principles and studies, and a reasonable degree of scientific certainty.

Signed under the pains and penalties of perjury.

*Brian E. Pape*

_____

**Brian E. Pape, Ph.D., BCFE, BCFM**

Electronically signed and witnessed by Dr. Pape on 04/28/2006

3

# BRIAN E. PAPE, Ph.D., BCFE, BCFM

## *- Specializing in Toxicology -*

B.A.   Washington University, 1966
M.S.   Michigan State University, 1969
Ph.D.  Michigan State University, 1974

| | |
|---|---|
| 1986-Present: | Pape & Associates, Inc. (*Specializing in Toxicology*)<br>Board-certifications: Forensic Examiner, Forensic Medicine |
| 1986-1997: | Assoc. Prof., University of Massachusetts Medical School (*Clin. Appt.*) |
| 1983-1986: | Senior Assoc. Consultant, Mayo Clinic (Rochester, MN); and, Director of Toxicology, New England Toxicology Services |
| 1973-1982: | Faculty, Department of Pathology, U of MO School of Medicine; Assoc. Prof. of Pathology and Director of Toxicology (*Full-tenure awarded*) |
| 1966-1972: | Graduate Research Assistant, Pesticide Research Center, MSU, Pesticide Chemistry (M.S. and Ph.D. research) and Toxicology |

Dr. Brian Pape is a consultant with Pape & Associates, specializing in toxicology and related sciences. From 1986 to 1997, he held a faculty appointment as Associate Professor of Pathology, University of Massachusetts School of Medicine.

From 1982 to 1985, he was Senior Associate Consultant for Mayo Clinic (Rochester, MN), and Director of Toxicology at New England Toxicology Services (Woburn, MA).

From 1973 to 1982, Dr. Pape was Director of Toxicology and Associate Professor in the Department of Pathology at the University of Missouri School of Medicine (Columbia, MO), where he was a member of the Emergency Room Committee, Environmental Trace Substances Research Center Advisory Committee, Committee on Pathogens-Toxins-and-Carcinogens, and Missouri Association of Crime Laboratory Directors' Technical Advisory Committee.

Dr. Pape has published more than 50 research papers, abstracts, and professional articles relating to alcohol and drugs, pesticides and toxic chemicals, analytical chemistry, forensic science, and general toxicology. He currently writes technical updates for the *Toxicology Reporter*.

He has served as a technical and expert consultant to business, labor, and governmental agencies. He has been qualified as an expert in toxicology and related sciences in District, Superior, and Federal Courts.

His expertise has been recognized by American Men and Women of Science, Who's Who in Technology Today, Who's Who in Medicine/Healthcare, and the scientific honorary Sigma Xi; and, he is a member of numerous scientific organizations.

Dr. Pape has been board-certified by the American College of Forensic Examiners (BCFE) and the American Board of Forensic Medicine (BCFM).

# ***APPENDIX  C***

Skip navigation



About MedlinePlus | Site Map | FAQs

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources

## Medical Encyclopedia

Other encyclopedia topics: A-Ag  Ah-Ap  Aq-Az  B-Bk  Bl-Bz  C-Cg  Ch-Co  Cp-Cz  D-Di  Dj-Dz  E-Ep  Eq-Ez  F  G
H-Hf  Hg-Hz  I-In  Io-Iz  J  K  L-Ln  Lo-Lz  M-Mf  Mg-Mz  N  O  P-Pl  Pm-Pz  Q  R  S-Sh
Si-Sp  Sq-Sz  T-Tn  To-Tz  U  V  W  X  Y  Z  0-9

## Toxicology screen

Printer-friendly version    E-mail to a friend

**Contents of this page:**

- Illustrations
- Alternative names
- Definition
- How the test is performed
- How to prepare for the test
- How the test will feel

- Why the test is performed
- Normal Values
- What abnormal results mean
- What the risks are
- Special considerations

**Illustrations**



Blood test

**Alternative names**    *Return to top*

Barbiturates - screen; Benzodiazepines - screen; Amphetamines - screen; Analgesics - screen; Antidepressants - screen; Narcotics - screen; Methanol - screen; Phenothiazines - screen; Isopropanol (rubbing alcohol) - screen; Drug abuse screen; Blood alcohol test

**Definition**    *Return to top*

These are various tests to evaluate the type (and roughly measure the amount) of legal and illegal drugs a person has taken.

**How the test is performed**    *Return to top*

Toxicology screening is most often performed on blood or urine (the specimens of choice) but can be performed on gastric contents (vomit or lavage fluids) if performed soon after the substance is ingested. Nails or hair can be tested for arsenic and mercury.

Blood is drawn from a vein on the inside of the elbow or the back of the hand. The puncture site is cleaned with antiseptic, and an elastic band is placed around the upper arm to apply pressure and restrict blood flow through the vein. This causes veins below the band to fill with blood.

A needle is inserted into the vein, and the blood is collected in an air-tight vial or a syringe. During the procedure, the band is removed to restore circulation. Once the blood has been collected, the needle is removed, and the puncture site is covered to stop any bleeding.

Urine sampling can be a random sample (you are asked to urinate into a container). In some circumstances, you may need to obtain the urine sample in the presence of the nurse or technician (to verify that the urine sample came from you and was not tampered with -- see special considerations).

**How to prepare for the test**    *Return to top*

There is no special preparation; this test is often performed as an emergency test. Inform the health care provider of any prescription and over-the-counter medications you have taken, including the amount and time of ingestion.

**How the test will feel**    *Return to top*

When the needle is inserted to draw blood, some people feel moderate pain, while others feel only a prick or stinging sensation. Afterward, there may be some throbbing.

If a urine sample is used, it involves only normal urination and there is no discomfort.

**Why the test is performed**    *Return to top*

This test can be used to evaluate possible accidental or intentional overdose or poisoning, such as when there is a need to evaluate the type and amount of legal and illegal drugs used by a person.

The test can be performed to determine the cause of acute drug toxicity, to monitor drug dependency, and to determine the presence of substances in the body (for medical and/or legal purposes). See also: Drug abuse first aid.

If the test is used as a drug screen there is a finite amount of time after ingestion that the drug or any of its metabolites can be detected:

- cocaine
  - 2 to 4 days; up to 10 to 22 days with heavy use
- amphetamines
  - 24 to 48 hours
- heroin
  - 1 to 2 days
- morphine
  - 1 to 2 days
- phencyclidine (PCP)
  - 1 to 8 days
- alcohol
  - 3 to 10 hours
- benzodiazepines
  - up to 6 weeks with high level use
- hydromorphone
  - 1 to 2 days
- tetrahydrocannabinol (THC)
  - 6 to 11 weeks with heavy use

- propoxyphene
  - 6 to 48 hours
- methadone
  - 2 to 3 days
- codeine
  - 1 to 2 days
- barbiturates
  - up to 6 weeks

**Normal Values**    *Return to top*

"Normal" levels vary according to the institution performing the test.

Blood can be tested for the presence and levels (amounts) of medications. Urine screening is usually reported as positive (substance is present) or negative (absent), but the level of certain substances can also be measured fairly accurately in urine.

Therapeutic levels are measured for prescribed or over-the-counter medications (see the specific medication).

Alcohol, prescription medications that are not prescribed, and illegal drugs are not normally present.

**What abnormal results mean**    *Return to top*

The presence of illegal drugs or drugs not prescribed for the person indicates illicit drug use.

Elevated levels of alcohol or prescription drugs can indicate intentional or accidental intoxication and/or overdose.

Additional conditions under which the test may be performed:

- alcohol withdrawal state
- alcoholism
- drug abuse monitoring
- analgesic nephropathy
- at risk for fetal alcohol syndrome
- complicated alcohol abstinence (delirium tremens)
- delirium
- dementia
- stroke secondary to cocaine

**What the risks are**    *Return to top*

The risks associated with having blood drawn are:

- excessive bleeding
- fainting or feeling lightheaded
- hematoma (blood accumulating under the skin)
- infection (a slight risk any time the skin is broken)
- multiple punctures to locate veins

**Special considerations**    *Return to top*

Commonly found substances on a toxicology screen include:

- alcohol (ethanol) -- "drinking" alcohol (see Alcohol and diet)
- amphetamines
- benzodiazepines
- antidepressants
- barbiturates and hypnotics
- isopropanol -- isopropyl alcohol, rubbing alcohol (toxic) (see isopropanol overdose)
- methanol -- methyl alcohol, found in antifreeze and other substances (toxic)
- narcotics
- non-narcotic analgesics
    - acetaminophen - oral
    - anti-inflammatory analgesics - oral
- phenothiazines (antipsychotic or tranquilizing medications)
- prescription medications, any type

This test is sometimes part of an investigation for drug use or abuse; special consents, handling and labeling of specimens, or other special procedures may be required.

**Update Date: 3/2/2006**

Updated by: Daniel R. Alexander, M.D., Department of Internal Medicine, St. Mary's Hospital, Leonardtown, MD. Review provided by VeriMed Healthcare Network.

**✦ADAM**



A.D.A.M., Inc. is accredited by URAC, also known as the American Accreditation HealthCare Commission (www.urac.org). URAC's accreditation program is the first of its kind, requiring compliance with 53 standards of quality and accountability, verified by independent audit. A.D.A.M. is among the first to achieve this important distinction for online health information and services. Learn more about A.D.A.M.'s editorial process. A.D.A.M. is also a founding member of Hi-Ethics (www.hiethics.com) and subscribes to the principles of the Health on the Net Foundation (www.hon.ch).

The information provided should not be used during any medical emergency or for the diagnosis or treatment of any medical condition. A licensed physician should be consulted for diagnosis and treatment of any and all medical conditions. Call 911 for all medical emergencies. Adam makes no representation or warranty regarding the accuracy, reliability, completeness, currentness, or timeliness of the content, text or graphics. Links to other sites are provided for information only -- they do not constitute endorsements of those other sites. Copyright 2005, A.D.A.M., Inc. Any duplication or distribution of the information contained herein is strictly prohibited.

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources
Copyright | Privacy | Accessibility | Quality Guidelines
U.S. National Library of Medicine, 8600 Rockville Pike, Bethesda, MD 20894
National Institutes of Health | Department of Health & Human Services                Page last updated: 04 October 2006

# Drug test

From Wikipedia, the free encyclopedia

> Some information in this article or section has **not** been **verified** and may not be reliable.
> Please **check for any inaccuracies**, and modify and **cite sources** as needed.

A **drug test** is a process using some kind of biological matter taken from an individual to determine previous drug use. It's a matter of much controversy; many have argued that it is an invasion of privacy, and the accuracy and effectiveness of some tests are also in question.

# Contents

- 1 General information
- 2 The NIDA 5
- 3 Detection periods
- 4 Common types of drug tests
    - 4.1 Urine drug screen
    - 4.2 Hair drug screen
    - 4.3 Saliva drug screen / Oral fluid-based drug screen
    - 4.4 Sweat drug screen
- 5 Drug testing methodologies
- 6 Types of testing
    - 6.1 Pre-employment drug testing
    - 6.2 Random drug testing
    - 6.3 Post-incident drug testing
- 7 Legality and Ethics of Mandatory Drugs Testing
    - 7.1 United Kingdom
- 8 See also
- 9 External links

# General information

Drug tests can be divided into two general groups. The first group is the kind most people are familiar with. This type of testing involves the donor giving a sample of some bodily fluid or hair to an employer, doctor, law enforcement official, or a medical testing center. This is normally a sample of urine, blood, hair, or saliva/ oral fluid. After collection from the donor, the sample is sealed with a tamper-evident seal and sent to a laboratory for analysis. The primary advantages of this type of test are accuracy, legal defensibility, and the ability to customize tests for a particular demographic group. The disadvantages are typically costs associated with the need for collection sites (urine, blood), and the delay in receiving results (up to 4 days.)

The second type of drug test is an on-site (workplace, school, washroom, or at-home) drug test that does not require a laboratory. These types of tests provide the advantages of lower cost and availability of results within

minutes. Furthermore, if on-site tests, such as oral fluid-based or saliva tests are used, the problem of "beating the tests" (otherwise known as sample adulteration or substitution) can be virtually eliminated. On-site tests provide qualitative results, and when supplemented with laboratory-based confirmation tests, can be defended in a court of law.

This article will focus primarily on the first type of test, but will refer to the latter when appropriate.

# The NIDA 5

Drug testing in the United States basically began in the late 1980's with the testing of certain federal employees and specified DOT regulated occupations. Drug testing guidelines and processes, in these areas exclusively, are established and regulated (by the Substance Abuse and Mental Health Services Administration, formerly under the direction of the National Institute on Drug Abuse or NIDA) require that companies who use professional drivers, specified safety sensitive transportation and/or oil and gas related occupations, and certain federal employers, test them for the presence of certain drugs. These test classes were established decades ago, and include five specific drug groups. They do *not* account for current drug usage patterns. For example, the tests do not include "synthetic opiates", such as oxycodone, oxymorphone, hydrocodone, hydromorphone, etc., compounds that are highly abused in America:

1. Cannabinoids (marijuana, hashish)
2. Cocaine (cocaine, crack, benzoylecognine)
3. Amphetamines (amphetamines, methamphetamine, speed)
4. Opiates (heroin, opium, codeine, morphine)
5. Phencyclidine (PCP)

While SAMHSA/NIDA guidelines only allow labs to report quantitative results for the "NIDA-5" on their official NIDA tests, many drug testing labs and on-site tests also offer a wider or "more appropriate" set of drug screens which are more reflective of current drug abuse patterns. As noted above, these tests include synthetic pain killers such as Oxycodone, Oxymorphone, Hydrocodone, Hydromorphone, benzodiazepines (Valium, Xanax, Klonopin, Restoril) and barbiturates in other drug panels (a "panel" is a predetermined list of tests to run). The confirmation test (usually GCMS) can tell the difference between methamphetamine and ecstasy, and in the absence of detectable amounts of methamphetamine in the sample, the lab will either report the sample as negative or report it as positive for MDMA. What the lab reports to the client depends upon whether MDMA was included in the panel as something to be tested for.

Gamma-hydroxy-butyrate (GHB) was not routinely tested for in the early 1990s, but due to increasing use, some labs have added it as an optional test. GHB is rare in pre-employment screening, but is commonly checked for in suspected cases of drug overdose, date rape, and post-mortem toxicology tests. Ketamine (Special K) may or may not be tested for, depending upon the preferences of the entity paying for the test, though testing for it is uncommon. In general, the greater the number of drugs tested for, the higher the price of the test, so many employers stick to the NIDA 5 for financial reasons.

Other drugs, such as meperidine (Demerol), fentanyl, propoxyphene, and methadone are not commonly tested for in most pre-employment situations. These drugs are more likely to be included in tests for certain demographic groups (such as healthcare workers, drug rehab patients, etc.)

Hallucinogens other than cannabis and PCP, such as mushrooms (psilocybin), LSD, and peyote (mescaline) are rarely tested for.

# Detection periods

The following chart gives approximate detection periods for each substance by test type. The ranges depend on amount and frequency of use, metabolic rate, body mass, age, overall health, and urine pH. For ease of use, the detection times of metabolites have been incorporated into each parent drug. For example, heroin and cocaine can only be detected for a few hours after use, but their metabolites can be detected for several days in urine. In this type of situation, we will report the (longer) detection times of the metabolites.

- NOTE 1: Oral fluid or saliva testing results for the most part mimic that of blood. The only exception is THC. Oral fluid will likely detect THC from ingestion up to a maximum period of 18-24 hours.
- NOTE 2: Urine can not detect current drug use. It takes approximately 6-8 hrs. post-consumption for drug to be metabolized and excreted in urine. Similarly, hair requires two weeks, and sweat, seven days.

| SUBSTANCE | URINE | HAIR | BLOOD |
|---|---|---|---|
| Alcohol | 3-5 days via Ethyl Gluconoride(EtG) metabolite | 12 hours | |
| Amphetamines (except meth) | 2 to 3 days | up to 90 days | 12 hours |
| Methamphetamine | 2 to 5 days | up to 90 days | 24 hours |
| Barbiturates (except phenobarbital) | 2 to 3 days | up to 90 days | 1 to 2 days |
| Phenobarbital | 7 to 14 days | up to 90 days | 4 to 7 days |
| Benzodiazepines | 1 to 5 days | up to 90 days | 6 to 48 hours |
| Cannabis | 28 to 49 days(1 to 3 days if the use is single) | up to 90 days | 2 days |
| Cocaine | 1 to 3 days | up to 90 days | 24 hours |

| | | | |
|---|---|---|---|
| Codeine | 2 to 3 days | up to 90 days | 12 hours |
| Cotinine (a break-down product of nicotine) | 2 to 4 days | up to 90 days | 2 to 4 days |
| Morphine | 2 to 3 days | up to 90 days | 6 hours |
| Heroin | 2 to 3 days | up to 90 days | 6 hours |
| LSD | 2 to 24 hours | unknown | 0 to 3 hours |
| PCP | 5 to 7 days | up to 90 days | 24 hours |

# Common types of drug tests

### Urine drug screen

Also known as urinalysis, this procedure requires that one provide a sample of urine. Either a test card is used on site for immediate results (see "General" section), or the sample is sent away to a lab to undergo gas chromatography/mass spectrometry (also known as GCMS), high performance liquid chromatography or immunoassay analysis. Sample substitution or adulteration have become a significant issue in the United States due to the prevalence of synthetic and/or drug-free urine and a wide range of adulterants on the internet. Some people attempt to defeat a urine test by drinking copious amounts of water, however, a sufficiently diluted sample may be rejected due to its clear color. Samples that are too clear may be flagged and tested for specific gravity. If the sample fails the specific gravity test, the sample is rejected and the dilution is reported to the entity that ordered the test. Some diuretics and herbal extracts, such as goldenseal, are marketed as a quick "detox" from controlled substances, but their efficacy is questionable. Some types of urinalysis can even detect the use of these "detox" products. One of the methods to test for adulterants is to add some amount of an actual drug to a small portion of the sample and then retest that portion. If a masking agent is present in the urine, the resulting drug test will have a negative result despite the fact that a drug was added. This situation is also usually reported to whomever ordered the test.

### Hair drug screen

Hair testing is quite accurate and can go back 6 months or longer, showing any controlled substances used in a sort of timeline. As hair grows out, any drugs used are encased in the hair shaft, so the longer the hair, the longer back in the individual's drug history the lab can detect. Most legitimate testing facilities, however, only use hair within about 3-5 cm of the scalp, and discard the rest. This limits the detection history to about 90 days, depending upon the rate of growth of the individual's hair. Some people attempt to circumvent this through shaving their heads. In the absence of the required amount of hair on the scalp, body hair can be used as an

acceptable substitute. Additionally, for pre-employment hair testing, the inability to obtain a sample may be grounds for not hiring the individual.

## Saliva drug screen / Oral fluid-based drug screen

Saliva / oral fluid-based drug tests can generally detect use during the previous few days. Saliva or oral fluid based drug tests are becoming more prevalent because of their convenience and the fact that they can not be adulterated. Furthermore, on-site oral based tests in particular enable the implementation of random testing programs, proven to be the most effective type of drug screening. Oral fluid based tests are as accurate as urine and can be obtained from quality suppliers in the United States. Testing is usually performed by employers, for either pre-employment, random, post-accident, reasonable suspicion, or return-to-duty testing. Oral fluid based testing most closely mimics results found with blood and is preferable for detecting on-the-job drug use or in post-accident applications in this case because the degree of intoxication can be approximated based on the amount of substance in the blood. The Victorian Police in Australia are also using random saliva-tests to detect drivers under the influence of amphetamines and cannabis. South Australian police were also given the power to drug-test drivers from 2006.

Detection in saliva tests begins immediately upon use:

- Marijuana and Hashish (THC): 1 hour after ingestion, for up to 14 hours
- Cocaine (including crack): From time of ingestion for 48 to 72 hours
- Opiates: From time of ingestion for 48 to 72 hours
- Methamphetamine and Ecstasy (MDMA, "Crank," "Ice"): From time of ingestion for 48 to 72 hours
- BZD: From time of ingestion for 48 to 72 hours

## Sweat drug screen

Sweat tests are patches attached to the skin to collect sweat over a long period of time (10-14 days). These are almost exclusively used by child protective services, parole departments, and other government institutions concerned with drug use over long periods, when urine testing is not practical. The patches have security features that keep them from being covertly removed and then reapplied without the knowledge of the testing agency. At the end of the test period, the patch is removed by a social worker or parole officer and sent to a lab for analysis. If the person has used any drugs during the period that the patch was in place, they will test positive for that drug. This type of testing has fallen out of favor with government agencies due to documented problems with certain drugs .

# Drug testing methodologies

Once the sample arrives at the lab for analysis, the different types of drug tests are tested in very similar ways. Before testing the sample, the tamper-evident seal is checked for integrity. If it appears to have been tampered with or was damaged in transit, the lab rejects the sample and does not test it.

One of the first steps for all drug tests is to make the sample testable. Urine and oral fluid can be used "as is" for

some tests, but other tests require the drugs to be extracted from urine beforehand. Strands of hair, patches, and blood must be prepared before testing. Hair is washed in order to eliminate second-hand sources of drugs on the surface of the hair, then the keratin is broken down using enzymes. Blood plasma may need to be separated by centrifuge from blood cells prior to testing. Sweat patches are opened up and the sweat collection component is soaked in a solvent to dissolve any drugs present.

Laboratory-based drug testing is done in a two-tiered fashion using two different types of detection methods. The first is known as the screening test, and this is applied to all samples that go through the lab. The second, known as the confirmation test, is only applied to samples that test positive during the screening test. Screening tests are usually done by immunoassay (EMIT for urine and blood, and ELISA for hair). The screening tests are typically less sensitive and more prone to false positives and false negatives than the confirmation test. Once a suspected positive sample is detected during screening, the sample is flagged and tested using the confirmation test. Samples that are negative on the screening test are discarded and reported as negative. The confirmation test in most labs (and all SAMHSA certified labs) is performed using mass spectrometry, and is extremely precise but also fairly expensive to run. False positive samples from the screening test will be negative on the confirmation test. Samples testing positive during both screening and confirmation tests are reported as positive to the entity that ordered the test. Most labs save positive samples for some period of months or years in the event of a disputed result or lawsuit.

# Types of testing

## Pre-employment drug testing

This is by far the most common type of drug test used by businesses. It has the advantage of being inexpensive, since only one test per employee needs to be paid for by the company. Furthermore, since most pre-employment drug testing is urine-based and subject to sample adulteration or substitution, the effectiveness of this approach has been questioned by federal legislators.

## Random drug testing

This is the most controversial type of drug testing regimen. Some also note that it is also the most effective method to deter drug use . It is usually used by corporations, drug rehab centers, prisons, and more recently, schools. This method may also be used on teens by their parents, or mandated to be performed on teens at school. The point of a random drug test is deterrence, as the threat of detection is much higher vs. other testing methods. Companies use various ways of determining who gets tested, ranging from drawing names out of a hat, to using more defensible methods such as robust random number generators. The goal of this test is to discourage drug use among employees, inmates, or students by not telling anyone who or when they are to be tested in advance. However, critics claim that random testing introduces a presumption of guilt, and is a violation of privacy if the user is not actually intoxicated during working hours. In addition, random testing is more likely to catch cannabis users, since THC metabolites have a longer duration in the body than those of more harmful and addictive drugs.

## Post-incident drug testing

**Schaffer Library of Drug Policy**

[Google Search]

○ Web ○ www.DrugLibrary.org

| Library Table of Contents | Search / What's New | Recommended Books | Feedback | Stop The Drug War |

**Information on Cocaine**

**Cocaine drug test**
Cocaine Detection Drug Test Most Accurate Instant Cocaine Tests
www.TestCountry.com

**Detox Your Body Fast**
1 Step Super Cleansing Removes Toxins For 5 Hours
www.MySupplementShop.com

**Urine Drug Test**
Drug Tests, FDA Approved, High Quality. Buy Direct and Save
www.btnx.com

**Hep C risk factors**
Include using IV drugs or shari straws - are you at risk?
haveyouever.com

Ads by Goooooogle

Adverti

## How long does it take for crack (or cocaine) to clear out of urine?

Ads by Goooooogle

**The Facts On Detoxing**
What They Don't Want You To Know. Separate The Truth From Fiction
www.justquery.com

**Instant on-site drug test**
Urine and saliva tests for as little as $0.99/test
www.USHealthTests.com

**Urine Drug Testing Info**
Get Info on Urine Drug Testing from 14 Search Engines in 1
www.info.com/UrineDrugTesting

**Beat DUI/DWI Test**
Proven Strategies For Beating DUI Tests
www.duirights.com

**PNH, a rare blood disease**
Causes a wide range of symptoms Source for information about PNH
www.PNHSource.com

Advertise on this site

URINE TESTING FOR COCAINE:

Metabolite Detectable Longer Than Expected In Some Cases

"How long will it take for crack (or cocaine) to clear out of my urine?" is a question received many times a day by the staff of the Drug & Poison Information Center. It is not a straightforward question.

First, cocaine itself is metabolized too rapidly to be measured for routine screening. When urine is being screened for the presence of cocaine, it is actually benzoylecgonine, a metabolite of cocaine, that is being measured.

Second, as to how long it will take for this metabolite to be eliminated from the urine, in some cases the answer may be longer than traditionally thought. Several studies suggest that benzoylecgonine can be detected in the urine of chronic, highdose abusers for longer periods of time than originally expected. Urine screens currently required by many employers use the minimum cutoff levels set by the National Institute of Drug Abuse (NIDA) to establish a positive drug test. A urine level of 300 nanograms per milliliter (or 300 micrograms per liter) of benzoylecgonine is considered a positive result for cocaine use. However, these levels can vary in the same individual depending on when the test is done. For example, first void of the day samples will yield the highest concentrations of drug metabolites. Testing urine at other times of the day will yield differing results, just as the concentration of urine itself changes throughout the day.

Due to these variations in urine concentration, positive test results can occur following a negative test result, although no additional cocaine was used. Many people try to avoid a positive test result by "watering up," or drinking large amounts of fluids to dilute their urine. Ideally, a 24-hour sample should be taken, but this is impossible in most work settings. Performing random urine sampling is about the only way to assure a representative specimen.

The widely accepted time period for benzoylecgonine to be cleared from the urine is three to five days. One study suggests that high dose users (i.e., 0.5

How Long Does it Take for Cocaine to Clear Out of Urine?  Page 2 of 2

Case 1:04-cv-02090-RBC   Document 119   Filed 10/18/2006   Page 26 of 28

gram or greater for each episode of use) can test positive after eight days. Another study claims that benzoylecgonine can be detected in heavy cocaine users for 10-14 days. The longest time over which positive urine levels of benzoylecgonine were detected was 10-22 days. This was after chronic use of extremely high doses of 112 grams per week. Since it is usually difficult to determine exactly how much cocaine is being abused by a caller, it seems that a broader range of potential detection times should be given when explaining cocaine metabolism in regard to urine testing.

---

**Urine Drug Testing Info**
Get Info on Urine Drug Testing from 14 Search Engines in 1
www.info.com/UrineDrugTesting

**Beat DUI/DWI Test**
Proven Strategies For Beating DUI Tests
www.duirights.com

**PNH, a rare blood disease**
Causes a wide range of symptoms Source for about PNH
www.PNHSource.com

Ads by Goooooogle                                                           Adverti

Contents | Feedback | Search | DRCNet Home Page | Join DRCNet

DRCNet Library | Schaffer Library | Cocaine and related drugs